IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ATF TRUCKING, L.L.C.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 06-4627** |
| | : | |
| **QUICK FREIGHT, INC., TRANSPORTATION RESOURCES, INC., and JOSEPH E. WORKMAN** | : | |

**MEMORANDUM OPINION**[1]

**Savage, J.** **July 29, 2008**

This contract dispute involving two competing national motor freight carriers and a sales agent arises out of one carrier's hiring the agent while he was under contract with the other carrier. The issues are whether the agent breached his exclusive agency contract with one carrier and whether the other carrier interfered with that contract when the agent went to work for the latter company.

In the trucking industry, carriers and shippers are typically brought together by independent sales agents. The agents solicit customers on behalf of the carriers and often provide drivers, known as owner-operators, to haul the freight under the carrier's banner. Most agents have their own lists of shippers and rosters of independent drivers. The carriers pay the agents a commission for each shipment they arrange. The carriers provide the legal operating authority,[2] trailers, insurance and administrative support.

---

[1] This memorandum opinion supplements the Findings of Fact and explains the rationale for the judgment.

[2] Interstate Operating Authority is granted by the United States Department of Transportation ("DOT"). DOT requires companies that operate "for hire" carriers that either transport federally regulated commodities or arranges for their transport in interstate commerce to have interstate operating authority, which dictates the type of operation a company may run, the cargo it may carry, and the geographical area in which it may legally operate. It also establishes the minimal insurance requirements and the financial responsibilities a company must maintain. *See* Interstate Operating Authority and Financial Responsibility, at http://fmcsa.dot.gov/registration-licensing/registration-OP.htm (last visited July 10, 2008).

Agents often switch from one carrier to another, taking with them their customers and drivers. They customarily enter into discussions with the competing carrier while still representing the other carrier so there is no interruption in service to the customers and work for the drivers. It is within this context that this dispute arises.

Joseph Workman is a principal and co-owner with his wife of Quick Freight Inc. and Transportation Resources Inc.,[3] companies that are engaged in soliciting and arranging for the shipment of freight via motor carriers. Quick Freight is a corporation Workman uses to enter into agency agreements with motor carriers. Transportation Resources performs brokerage functions, matching customers with motor carriers to haul freight.

For twenty years, Workman has worked in the trucking industry and has been an agent for several carriers on a non-exclusive basis. In early 2005, Workman was solicited by Albert Pinion ("Pinion"), a recruiter for plaintiff ATF Trucking L.L.C. ("ATF"), who sought Workman's book of business. At the time, Workman was an agent for Dart Transport Inc. ("DART"), with which he had entered into a sales agency agreement in 2004. Pursuant to the DART agreement, Workman provided owner-operators to haul customers' freight using DART's authority. While working with DART, Workman maintained his brokerage authority, which he later gave up when he joined ATF.

In April 2005, Workman met with Pinion, ATF's chief financial officer and its director of operations, to discuss becoming an agent for ATF. He was offered a $100,000 signing bonus for his commitment to generate $4.5 million annually in freight revenue for ATF. During the time he was having discussions with ATF about becoming its agent, Workman

[3] Throughout this memorandum opinion, defendants Workman, Quick Freight and Transportation Resources are referred to collectively as Workman.

continued to perform as DART's agent, and ATF was aware of Workman's ongoing relationship with DART.

On April 14, 2005, Workman was provided a draft contract that consisted of a sales agency agreement and an addendum. After his attorney reviewed the draft document, Workman advised ATF that he would enter into the agreement. On May 2, 2005, Workman executed an agency agreement with an effective date of April 30, 2005. The agreement provided that Workman would represent ATF exclusively for a period of thirty-eight months.

Soon after Workman left DART and took his drivers to ATF, Workman's owner-operators experienced payroll problems. They complained of receiving partial payments, late payments, or no pay at all. Workman's attempts to intercede with ATF to rectify the situation were unsuccessful. Drivers resigned, and others were threatening to quit hauling for ATF.

Other issues also strained the agency relationship. Workman complained that he was getting no brokerage support. Also, there were problems with dispatching, billing, accounting, and customer invoicing. Finally, in December 2005, ATF unilaterally cut Workman's commission on a transaction involving Workman customer Honeywell. Despite the cut in his commission and the other problems, Workman continued to act as ATF's agent.

In early 2006, as a result of these difficulties, Workman decided to leave ATF. On February 28, 2006, Workman met with Pinion, who had left ATF the previous July to become a recruiter for Mason and Dixon Lines Inc. ("MADL"), to discuss an agency agreement. The day following his meeting with Workman, Pinion reported to MADL's

president regarding his discussions with Workman and the possibility of bringing Workman on as a sales agent. In the ensuing weeks and months, Workman and Pinion discussed specifics about how to make a sales agency relationship work between Workman and MADL. They compared rates of different customers and carriers so that MADL could "mirror" ATF's rates with Workman's customers, especially those affecting his biggest client, Hydro Aluminum North America ("Hydro Aluminum").

Workman supplied Pinion with the names of owner-operators who were currently transporting freight pursuant to Workman's relationship with ATF. The owner-operators were drug tested and their driving records were checked in order to qualify them to drive for MADL. The purpose of qualifying the drivers before switching them to MADL was to ensure a seamless transition that would not interrupt the shipping for Workman's customers.

During the week of April 24, 2006, MADL conducted an orientation program for the owner-operators who intended to continue transporting freight under Workman's direction pursuant to MADL authority. On May 11, 2006, Pinion supplied MADL a list of Workman's owner-operators who qualified under MADL's protocol. Those drivers eventually transferred with Workman to MADL.

In early May 2006, Pinion and Workman met with the Hydro Aluminum people to discuss rates and a smooth transition from ATF to MADL. Finally, on May 18, 2006, Workman sent a letter to ATF notifying it that he was terminating his relationship.

On October 13, 2006, ATF filed its complaint for breach of contract against Workman. He answered that ATF's breach of the contract caused the termination. ATF later filed an amended complaint adding MADL as a defendant, contending that it tortiously

interfered with the contract between ATF and Workman. After discovery was completed, the case was tried non-jury.

**Breach of Contract**

ATF and Workman accuse each other of breaching the contract. Under Pennsylvania law,[4] a breach of contract occurs when a party to the contract fails to perform a contractual duty or violates an obligation. *Widmer Eng'g Inc. v. Dufalla,* 837 A.2d 459, 467 (Pa. Super. 2003) (citing Restatement (Second) of Contracts § 235(2) (1981)); *Camenisch v. Allen,* 44 A.2d 309, 310 (Pa. Super. 1945). Where the parties have a mutual agreement that makes each one's performance dependent on the other's, a party may treat the other party's failure to perform as a breach. *Mallinger v. Mallinger,* 175 A.2d 890, 891 (Pa. Super. 1961); *Camenisch,* 44 A.2d at 310. In that instance, the non-breaching party is relieved of its obligation under the contract. In other words, where a party to the contract prevents the other party from performing its part, the contract is breached. *Apalucci* v. *Agora Syndicate, Inc.*, 145 F.3d 630, 634 (3d Cir. 1998) (citing *Borough of Nanty-Glo v. Am. Sur. Co. of New York,* 175 A. 536, 537 (Pa. 1934)).

Where both parties materially breach a contract,[5] neither may recover for the other's breach. *Nikole, Inc. v. Klinger,* 603 A.2d 587, 593 (Pa. Super. 1992); *Ott v. Buehler Lumber Co.,* 541 A.2d 1143, 1145 (Pa. Super. 1988). Accordingly, when a party seeks to enforce an agreement or recover damages for a breach of a contract, it must prove that

---

[4] The contract designates and the parties agree that Pennsylvania law governs. April 30, 2005, Sales Agency Agreement ¶ 4.

[5] A material breach is a breach so substantial that it makes it impossible for the injured party to perform its obligations. *See Widmer Eng'g,* 837 A.2d at 468. In determining whether a breach is material, the facts of the case are taken into account. *See id.*

it has performed all of its obligations under the contract. *Trumbull Corp. v. Boss Constr. Inc.,* 801 A.2d 1289, 1292 (Pa. Commw. 2002). Put another way, when a party has not performed all of its obligations, it cannot recover.

Workman contends that his ending the relationship was caused by ATF's material breach. Specifically, he cites ATF's unilaterally reducing his commission on a Honeywell transaction; its failing to accurately pay the owner-operators in a timely fashion; and failing to provide the promised network of trucks, computerized logistics and network of brokerage partnerships.

ATF charges that Workman terminated the exclusive agency agreement prior to the expiration of the term and did not deliver the volume of business he had promised. ATF vigorously disputes Workman's claims regarding the payments to the owner-operators and its failing to support Workman. But, it did not dispute that it reduced Workman's commission on a Honeywell transaction.

During the course of the agency relationship, ATF advanced monies to some of the owner-operators to be repaid by payroll deduction. In some instances, ATF deducted the payments from Workman's commissions rather than from the owner-operators who were responsible for the payment. There was nothing in the contract giving ATF the authority to do so without Workman's guarantee.

Given that ATF breached its contractual obligations under the contract and impaired Workman's ability to perform his obligations, Workman was entitled to terminate the contract, and ATF cannot recover damages for the loss of business resulting from the termination. The "sign on bonus," however, is treated differently. When Workman signed the agency agreement, ATF advanced him a $100,000 "sign on bonus" in consideration

for his "commitment to generate $4,500,000.00 Freight Revenue for each 12 month period commencing July 1, 2005 and each anniversary thereafter."[6] When he left ATF, Workman had worked ten and a half months of the first fiscal year, generating $1,637,457 in revenue. Using the contractual formula,[7] Workman earned only $14,269.78 of the bonus in the first year. Because he left ATF, he gave up any right to the remaining two years. Therefore, ATF is entitled to the return of the unearned "sign on bonus."

**Tortious Interference With Contract**

ATF alleges that MADL induced Workman to terminate his contract with ATF so that MADL could get Workman's business. ATF claims this inducement constituted a tortious interference with its contract with the Workman defendants, causing it to lose business.

The four elements of a claim for tortious interference with contractual relations are: (1) the existence of a contractual relationship between the plaintiff and a third party; (2) purposeful action on the part of the defendant aimed at harming the existing contractual relationship; (3) the absence of privilege or justification for the defendant's action; and (4) actual damage resulting from the defendant's conduct. *Crivelli v. General Motors Corp.,* 215 F.3d 386, 394 (3d Cir. 2000) (citing *Strickland v. Univ. of Scranton*, 700 A.2d 979, 985 (Pa. Super. 1997)).

There is no dispute that there was a contract between ATF and the Workman defendants. Nor is there any question what Workman did terminating the contract. The issues in contention revolve around MADL's role in the termination.

---

[6] Addendum A to April 30, 2005, Sales Agency Agreement.

[7] The Agreement provides for Workman to reimburse ATF a pro rata portion of the signing bonus if he does not meet 85% of the $4.5 million revenue target annually. Addendum A to April 30, 2005, Sales Agency Agreement.

MADL did engage in conduct that was calculated to sign Workman as its agent, knowing that he would sever his relationship with ATF. But, its conduct was not specifically intended to harm ATF's existing contract with Workman. At the time he entered into discussions with Pinion, Workman already had decided to move his business away from ATF because the relationship between ATF and Workman had deteriorated beyond repair. Had he not signed with MADL, Workman would have taken his business to another trucking company. In short, MADL did not induce Workman to terminate his contract with ATF.

Liability is imposed only where the defendant's actions were intended to cause the interference. *Ruffing v. 84 Lumber Co.,* 600 A.2d 545, 549-550 (Pa. Super. 1991). The inquiry is whether the interference was improper under the circumstances. In considering whether the conduct was justifiable, one must consider whether MADL's conduct was done to cause the interference or was merely incidental to another purpose. *Nathanson v. Med. Coll. of Pennsylvania,* 926 F.2d 1368, 1388 (3d Cir. 1991). Conduct that has been accepted as comporting with the "rules of the game" adopted by society is not considered improper. *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F. 2d 1358, 1381 (3d Cir. 1992) (quoting *Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 393 A.2d 1175, 1184 (Pa. 1978)); *Franklin Music Co. v. Am. Broad. Co.,* 616 F.2d 528, 544 (3d Cir. 1979) (citing Restatement (Second) of Torts § 767 (1977)).

MADL's recruiting of Workman was not improper. Because Workman had already decided to terminate his relationship with ATF, MADL did not intend to bring about the demise of that relationship.

MADL's recruitment practices complied with the "rules of the game" within the freight carrier business. It is not uncommon in the trucking industry for agents to move business from one company to another. Carriers employ recruiters for the specific purpose of hiring agents to secure freight business. Pinion was a recruiter for ATF and later for MADL. His responsibility with both companies was to recruit and maintain independent sales agents to develop business. While working for ATF, he recruited Workman from DART. The recruiting process Pinion used in moving Workman from DART to ATF was the same process he later employed to transfer Workman from ATF to MADL.

Pinion, acting on behalf of MADL, did not intend to interfere with the existing relationship between Workman and ATF. In fact, he took advantage of an opportunity that he would have missed had he not sought to recruit Workman for MADL. Because Workman had already decided to leave ATF, he simply would have gone to another carrier to forge an agency relationship. In sum, MADL was not motivated by an intent to harm ATF.

ATF undoubtedly suffered damage when Workman took his business to MADL. However, ATF had to prove that the damage was caused by MADL's interference with the contract between ATF and Workman. It did not. The damage was caused by Workman's decision to end his relationship with ATF, a decision he had made before engaging in negotiations with MADL. Thus, ATF's damages, if any, were not the result of MADL's conduct.

**Confidential Information**

ATF claims two of its former recruiters, Pinion and Jay Achterhoff, are using confidential information that was stored on ATF laptop computers they purchased from

ATF and took with them when they left its employ. Both denied using the information to recruit agents after leaving ATF. Pinion had his own data regarding Workman on the computer that he referred to in his dealings with Workman. In any event, there is no evidence that the former employees used any ATF proprietary information after receiving a cease and desist letter from ATF's counsel. Therefore, ATF's request for an injunction will be denied.

**Conclusion**

Because ATF breached its contract with Workman, it is not entitled to damages for Workman's terminating his relationship with it. However, ATF is entitled to the return of the unearned "sign-on" bonus. MADL's conduct in hiring Workman when he was under contract with ATF was not improper and did not interfere with that contract. Therefore, judgment will be entered in favor of the Workman defendants and MADL and against ATF.